## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC. and AMGEN MANUFACTURING, LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> HOSPIRA, INC., <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      C.A. No. 1:15-cv-00839-RGA |

**OPENING BRIEF IN SUPPORT OF AMGEN'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW OF INFRINGEMENT
OF THE '349 PATENT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

*Of Counsel*:

Kevin M. Flowers
Mark H. Izraelewicz
John R. Labbé
Julianne M. Hartzell
Benjamin T. Horton
Douglas G. Bolesch
Yun Wei
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 S. Wacker Drive
Chicago, Illinois 60606-6357
(312) 474-6300

Nicholas Groombridge
Eric Alan Stone
Jennifer H. Wu
Stephen A. Maniscalco
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

Robert W. Whetzel (#2288)
Jason J. Rawnsley (#5379)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7634
whetzel@rlf.com
rawnsley@rlf.com

*Attorneys for Plaintiffs Amgen Inc.
and Amgen Manufacturing, Limited*

Wendy A. Whiteford
Thomas F. Lavery IV
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320-1789
(805) 447-1000

Date: October 23, 2017

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   LEGAL STANDARDS ................................................................................................4

    A.    Motion for judgment as a matter of law under Rule 50 ...........................................4

    B.    Motion for a new trial under Rule 59(a) .................................................................4

III.  AMGEN IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON
      INFRINGEMENT OF THE '349 PATENT ................................................................5

    A.    Amgen established that Hospira's cells infringe claims 1-7 of the '349
         patent......................................................................................................................5

    B.    No reasonable jury could find that Hospira's cells were incapable of
         producing EPO at the rates recited in the '349 claims..............................................8

        1.    No reasonable jury could have ignored Hospira's admitted
            production rate, and conversion to Units of EPO .......................................9

        2.    The claims do not exclude proof of infringement using an assay
            other than RIA.........................................................................................10

        3.    Dr. Hamilton failed to rebut Amgen's infringement evidence .................11

IV.   A NEW TRIAL IS WARRANTED UNDER RULE 59 .................................................15

    A.    The jury's verdict was contrary to the great weight of the evidence....................15

    B.    Hospira's legally incorrect argument to the jury that the '349 claims
         require RIA evidence for infringement warrants a new trial ...............................15

V.    CONCLUSION...........................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Allied Chem. Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980)................................................................................ 5

*Amgen Inc. v. F. Hoffmann-La Roche Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) ........................................... 10, 11, 15, 16

*Brennan v. Norton*,
350 F.3d 399 (3d Cir. 2003) ............................................................. 15

*LG Elecs. USA, Inc. v. Whirlpool Corp.*,
798 F. Supp. 2d 541 (D. Del. 2011)...................................................... 5

*Lind v. Schenley Indus., Inc.*,
278 F.2d 79 (3d Cir. 1960) ............................................................... 5

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
61 F. Supp. 2d 199 (D. Del. 1999)....................................................... 4

*Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059 (Fed. Cir. 1998) ......................................................... 4

*Pannu v. Iolab Corp.*,
155 F.3d 1344 (Fed. Cir. 1998) ......................................................... 4

*Perkin-Elmer Corp. v. Computervision Corp.*,
732 F.2d 888 (Fed. Cir. 1984) .......................................................... 4

*Roebuck v. Drexel Univ.*,
852 F.2d 715 (3d Cir. 1988) ........................................................... 15

*Seachange Int'l., Inc. v. C-Cor, Inc.*,
413 F. 3d 1361 (Fed. Cir. 2005) ...................................................... 15

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
308 F.3d 1167 (Fed. Cir. 2002) ......................................................... 4

*Williamson v. Consol. Rail Corp.*,
926 F.2d 1344 (3d Cir. 1991) ........................................................... 5

**Statutes**

Federal Rule of Civil Procedure 50 ................................................. 1, 3, 4

Federal Rule of Civil Procedure 59 ................................................. 4, 14

## I.     INTRODUCTION

Hospira infringed claims 1-7 of U.S. Patent No. 5,756,349 ("the '349 patent") when it manufactured its batches of epoetin (EPO) drug substance in 2013, 2014, and 2015. Accordingly, Amgen renews its motion for judgment as a matter of law of infringement.[1]

In 2013, 2014 and 2015, Hospira used a commercial manufacturing process, scaled to 20,000 liters, to amass a stockpile of EPO drug substance for commercial inventory. Hospira's cells and commercial-scale process satisfied all of the claim limitations of the '349 patent, which is directed to cells capable of making large, specified amounts of EPO. In view of the trial evidence, Hospira's infringement can be determined as a matter of law, because no reasonable jury could have concluded that Hospira did not infringe.

The undisputed trial evidence established that Hospira made its EPO drug substance using "vertebrate cells," "propagated in vitro," "capable upon growth in culture of producing erythropoietin," and "comprising non-human DNA sequences" to "control transcription of DNA encoding human erythropoietin." Hospira's own documents submitted to the FDA and its own witnesses' testimony established that its cells satisfied each of these limitations of the '349 claims. Hospira did not contest at trial that its cells and its process satisfied these claim limitations.

The only issues Hospira raised at trial concerned whether its cells were "capable of" producing EPO at a rate of 100, 500, or 1000 Units per million cells in 48 hours "as determined by radioimmunoassay." The only evidence introduced at trial about the production rate of Hospira's cells established that they were capable of producing EPO at a rate of more than 3500

---

[1] Amgen moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) during trial before the case was submitted to the jury. (Trial Tr. at 1361:20-1362:20.)

Units per million cells in 48 hours, far more than the 100, 500, or 1000 Units required in the claims.

Hospira admitted in its submissions to the FDA that its cells produced EPO at a rate of "100 μg per ml or higher" (that is, 100 micrograms of EPO per milliliter of cell-culture medium per day) when they were grown in culture. Amgen's expert, Dr. McLawhon, calculated that this amount represents a production rate of more than 3,500 Units of EPO per million cells in 48 hours, far more than necessary to satisfy the '349 claim limitations.

Hospira's expert, Dr. Hamilton, did not offer any affirmative evidence or an opinion that Hospira's cells were not capable of producing EPO at the rates recited in the '349 claims. Dr. Hamilton did not present an alternative to Dr. McLawhon's calculation converting micrograms of EPO per milliliter (as Hospira submitted to the FDA) to Units of EPO produced per million cells in 48 hours (as in the '349 claims), nor did he suggest there was any calculation error.

Dr. Hamilton admitted that he did not consider whether Hospira's cells were capable of producing EPO at the rates recited in the '349 claims. Instead, he offered general testimony that Amgen had not proven Hospira's infringement. He questioned the reliability of Hospira's dot-blot assays in quantitating EPO production levels at or above 100 μg per ml or higher despite the fact that Hospira relied on the results of these dot-blot assays when it represented to the FDA in its Biologic License Application ("BLA") that its cells produced EPO at this rate.

Dr. Hamilton also criticized Dr. McLawhon for not using the particular EPO standard or antibody described in the '349 patent, even though the '349 claims were not construed to require their use. And, in an ironic reversal of position, Dr. Hamilton then criticized Dr. McLawhon for relying on the results of testing the unpurified EPO produced by Hospira's cells, even though the '349 patent described the testing of such unpurified EPO.

2

No reasonable jury could have discounted Hospira's admissions in its statements to the FDA about the EPO production rates of its cells. No reasonable jury could have discounted Dr. McLawhon's testimony, based on the plain and ordinary meaning of the claim language, that the "capable of producing erythropoietin" limitations in the '349 claims do not require that one actually perform an RIA. And no reasonable jury could have discounted Dr. McLawhon's calculation, the only calculation in evidence, showing that Hospira's cells produced more than 3,500 U of EPO per million cells in 48 hours, far more than was required to satisfy the "capable of producing erythropoietin" limitations in the claims.

The jury was not free to disregard the only evidence presented at trial about the EPO production rate of Hospira's cells. The '349 claims do not require that a particular assay be performed: they only require that the cells be "capable of" producing EPO at the recited rates. The Court instructed the jury that the "law makes no distinction between the weight you should give either direct or circumstantial evidence, nor does it say that one type of evidence is any better evidence than the other." (Trial Tr. at 1537:17-21.)

Finally, during closing argument, over Amgen's objection, counsel for Hospira argued to the jury that data from an RIA is required to prove infringement of the '349 claims, and that production-rate evidence based on a dot-blot assay necessarily means Hospira's cells and process fell outside the scope of the '349 claims. Because this argument presented a claim construction that the Court never adopted and for which there was no supporting testimony at trial, the Court should grant a new trial on the issue of infringement of the '349 patent.

Accordingly, under Fed. R. Civ. P. 50(b), the Court should enter judgment as a matter of law that Hospira infringed the '349 claims, or in the alternative, grant a new trial on the issue of infringement.

## II.    LEGAL STANDARDS

### A.    Motion for judgment as a matter of law under Rule 50

Under Federal Rule of Civil Procedure 50, judgment as a matter of law ("JMOL") is warranted if the Court finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1187 (Fed. Cir. 2002) (applying Third Circuit law). "To prevail on a renewed motion for JMOL following a jury trial, a party 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citation omitted); Fed. R. Civ. P. 50(b). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984). A court may grant JMOL in favor of a party bearing the burden of proof "where (1) the movant has established [its] case by evidence that the jury would not be at liberty to disbelieve;" and (2) "the only reasonable conclusion is in [the movant's] favor.'" *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 61 F. Supp. 2d 199, 237 (D. Del. 1999) (quoting *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed. Cir. 1998)).

### B.    Motion for a new trial under Rule 59(a)

A new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The decision to grant or deny a new trial is within the sound discretion of the trial court." *LG Elecs. USA, Inc. v. Whirlpool Corp.*, 798 F. Supp. 2d 541, 558 (D. Del. 2011). "In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the

complexity or simplicity of the legal principles which the jury had to apply to the facts." *Id.* (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 89 (3d Cir. 1960)). A new trial should be conducted where "the verdict was against the weight of the evidence . . . [and] a miscarriage of justice would result" if the verdict stands. *Id.* (quoting *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991)). "Unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner." *Id.* (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)).

## III.   AMGEN IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON INFRINGEMENT OF THE '349 PATENT

### A.   Amgen established that Hospira's cells infringe claims 1-7 of the '349 patent

Claims 1-6 of the '349 patent recite vertebrate cells that, upon growth in culture, are capable of producing EPO at a rate of 100, 500, or 1000 "U of erythropoietin per l0$^6$ cells in 48 hours as determined by radioimmunoassay." ('349 patent at 38:8-36.) The claims also recite that the cells contain DNA sequences that initiate and may regulate the processes of transcribing the DNA encoding EPO into a form that can be used to produce EPO. (*Id.* at claims 1 and 4.) Claim 7 of the '349 patent recites a process for producing EPO by growing the cells of claims 1-6 under suitable conditions. (*Id.* at claim 7.)

Relying on Hospira's admissions, Amgen's experts, Drs. Randolph Wall and Ronald McLawhon, testified that Hospira's cells satisfied all of the limitations in claims 1-7 of the '349 patent. First, Hospira's cells are vertebrate cells because they are derived from a Chinese Hamster Ovary cell line. (Trial Tr. at 273:1-21.) Second, Hospira's cells include the required "non-human DNA sequences which control transcription of DNA encoding human erythropoietin" in claim 1, and "transcription control DNA sequences other than human erythropoietin transcription control sequences" in claim 4, because, as Dr. Wall explained,

Hospira's cells utilize a promoter from the murine cytomegalovirus, MCMV, which is non-

human DNA that satisfies the transcription-control limitations in claims 1 and 4 of the '349

patent. (Trial Tr. at 274:8-275:4.)

Hospira did not deny that it used vertebrate cells with the requisite transcription-control

sequences, grown in culture to produce EPO. (Trial Tr. at 273:22-274:5; 275:11-18.) At trial,

Amgen presented the following deposition testimony of Dr. Billingham, one of Hospira's

scientists responsible for Hospira's EPO program:

> Q.   So to make Hospira's Epoetin drug substance, GSK grows cells in culture,
>       correct?
>
> A.   Correct.
>
> Q.   And those are Chinese hamster ovary cells?
>
> A.   Yes, they are.
>
> Q.   Those are also known as CHO cells, correct?
>
> A.   Yes.
>
> Q.   And those are vertebrate cells, correct?
>
> A.   Yes.
>
> Q.   And those particular CHO cells are genetically engineered to produce
>       erythropoietin when grown in culture, correct?
>
> A.   Yes.
>
> Q.   And those cells are grown in culture in vitro, is that right?
>
> A.   Yes.

(Trial Tr. at 298:5-24.) Likewise, Hospira's submissions to the FDA confirmed that its cells

satisfied all of these claim requirements. In its BLA seeking approval to market its EPO product,

Hospira described its cells as "the erythropoietin production cell line used to manufacture

Epoetin Hospira DS [drug substance]" and said that its cells are Chinese Hamster Ovary cells

(vertebrate cells) that are capable of growing in a cell culture. (DTX-131 at 14.) As Dr. Wall testified, the document further says that Hospira's cells include non-human sequences to control expression of the DNA sequence coding for human EPO. (DTX-131 at 31; Trial Tr. at 277:7-278:5.)

The overwhelming evidence established that Hospira's cells also satisfied the EPO production-rate limitations. First, Hospira admitted, in a report it submitted to the FDA as part of its BLA, that its cells produce EPO "in the range of 100 µg or higher" each day.  (PTX-293 at 28 ("EPO concentration in supernatant estimated from dot blot analysis is in the range of 100 µg per ml or higher . . . ."); Trial Tr. at 525:8-17; 526:21-528:7.) Hospira's expert, Dr. Hamilton, admitted that Hospira never withdrew or otherwise contradicted this admission. (Trial Tr. at 1213:1-1214:7.)

Based on this admission, Amgen's expert Dr. McLawhon testified that Hospira infringed the EPO production-rate limitations of the '349 claims. Dr. McLawhon explained that the admitted daily EPO production rate could be converted into the "U" of EPO recited in the '349 claims. (Trial Tr. 525:1-536:11.) Dr. Hamilton admitted the daily amount of EPO produced could be converted into "Units" of EPO to analyze the infringement issue, but unlike Dr. McLawhon, Hamilton failed to perform that conversion. (Trial Tr. at 1213:24-1214:16.)

Thus, Dr. McLawhon's calculation was the only evidence presented to the jury on the EPO production rate of Hospira's cells. According to that calculation, Hospira's cells were capable of producing 3,534 U of EPO per $10^6$ cells (million) cells in 48 hours, far more than the 100, 500, or 1000 Units recited in the '349 claims. (Trial Tr. 536:5-14.)

**B.      No reasonable jury could find that Hospira's cells were incapable of producing EPO at the rates recited in the '349 claims**

Hospira's non-infringement defense focused on whether its cells satisfied the EPO production-rate limitations. Ironically, Hospira disputed its own evidence submitted to the FDA establishing the production rate of its cells. To do so, Hospira relied on speculation from Dr. Hamilton about the test underlying Hospira's admitted EPO production rate: a "dot-blot" immunoassay. More specifically, Dr. Hamilton questioned the reliability of that test to quantitate EPO production levels, despite it having been relied upon by Hospira for its representation to the FDA that its cells produced EPO at "100 μg per ml or higher."

Hospira's counsel went so far as to argue during closing argument that the '349 claims require an RIA test, while any other test falls "outside the fence" (that is, outside the scope of the claims). (Trial Tr. 1641:9-1642:6) ("[W]e now know based on the evidence that what is inside the fence is as determined by RIA. . . . But outside the fence is dot blot. The evidence, dot blot is not specified in the claims. RIA is.").

The '349 claims, however, do not require that any particular test be performed to determine the production rate of infringing cells. Instead, the claims require that the accused cells be "capable of" producing EPO in the medium of their growth "in excess of 100 [or 500 or 1000] U of erythropoietin per $10^6$ cells in 48 hours as determined by radioimmunoassay." (PTX-001 ('349 patent), claims 1-6.) The plain and ordinary meaning of "capable of producing" EPO at such rates does not require that any particular assay be performed.

Neither Hospira's expert's testimony, nor Hospira's improper attorney argument, supported the jury's non-infringement verdict.

### 1. No reasonable jury could have ignored Hospira's admitted production rate, and conversion to Units of EPO

Hospira admitted in its report to the FDA that its dot-blot assay showed that its cells produced 100 micrograms of EPO in each milliliter of cell-culture medium each day. (PTX-293 at 28 ("EPO concentration in supernatant estimated from dot blot analysis is in the range of 100 μg per ml or higher . . . .").) The parties' respective experts agreed that this daily production rate could be converted to "Units" of EPO using a "standard," which is analogous to converting currency in a currency exchange, to yield a daily production rate in "U" as recited in the '349 claims. (Trial Tr. at 525:1-526:4 (McLawhon); 1213:24-1214:7 (Hamilton).) Dr. McLawhon used the standard to convert the production rate to 1,767 U of EPO per million cells per day, which is a production rate of 3,534 U of EPO per million cells in 48 hours. (Trial Tr. 536:2-14.) Dr. Hamilton did not provide any testimony on the "Units" of EPO corresponding to Hospira's daily production rate: he testified that he had not performed the calculation. (Trial Tr. at 1213:24-1214:12.)

Hospira did not deny that its cells were capable of producing 100 micrograms of EPO per milliliter per day (Trial Tr. at 1213:1-9), or that this amount of EPO was sufficient to satisfy the production-rate limitations in the '349 claims (Trial Tr. at 1213:24-1214:7) ("Q. Dr. McLawhon, to the best of your knowledge, does Hospira deny that its cells can meet the production rate? A. No, they do not.") Indeed, its expert, Dr. Hamilton, did not offer any affirmative evidence, opinion or fact, that Hospira's cells were incapable of producing EPO at the claimed production levels, and admitted he had not considered whether Hospira's cells were capable of producing EPO at the rates claimed in the '349 patent. (Trial Tr. at 1208:23-1210:6.)

Hospira's failure to offer any evidence to rebut its own admitted production rate, its failure to calculate the corresponding number of Units of EPO, and its expert's failure to offer an

opinion of noninfringement mean that no reasonable jury could have concluded that Amgen failed to meet its burden on infringement.

### 2. The claims do not exclude proof of infringement using an assay other than RIA

During closing argument, and over Amgen's objection, Hospira's counsel told the jury that the '349 claims require results from an RIA, and that dot-blot assays fall outside the scope of the claims, such that the results of Hospira's dot-blot assays could not be used to prove that Hospira infringed the EPO production-rate limitations. (Trial Tr. 1641:11-1642:6.) ("The fence, there was nothing written up there in his opening, but we now know based on the evidence that what is inside the fence is as determined by RIA. . . . But outside the fence is dot blot.")

This was a claim construction argument that Hospira should have made, if at all, to the Court, not the jury. Under the plain and ordinary meaning of the claim terms, the '349 claims do not require RIA *evidence*, and Hospira offered no evidence of the plain and ordinary meaning to the contrary. The '349 claims do not require any specific form of evidence, and certainly the "fence"—the scope of the claims—has nothing to do with the triable issue: whether Hospira's admission based on its dot-blot assays is sufficient proof that Hospira's cells produce at least 100, 500, or 1000 U of EPO per million cells in 48 hours.

While this Court did not construe the production-rate limitations, the Federal Circuit in *Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340 (Fed. Cir. 2009) ("*Roche*") held that this limitation does not require that one actually perform a radioimmunoassay ("RIA"); rather, infringement can be proven based on a "comparable" test. *Id.* at 1385 ("Neither was Amgen required to establish infringement [of the '349 claims] by offering RIA data into evidence."). The jury in this case was instructed that it could rely on circumstantial evidence, and that the law

does not favor direct evidence over circumstantial evidence. (Trial Tr. at 111:13-112:13; 1536:24-1537:23.)

As the Federal Circuit held in *Roche*, a "comparable" test, such as Hospira's dot-blot assays, is sufficient to prove infringement. Hospira's argument to the jury, using the fence analogy where a dot-blot assay is "outside the fence," improperly suggested that the jury had to categorically exclude evidence from Hospira's dot-blot assays. Hospira's improper argument suggested to the jury that it could have concluded that Amgen failed to meet its burden on infringement because instead of relying on results from an RIA assay, Amgen relied on the results from Hospira's own dot-blot assays. Drs. Wall and McLawhon provided substantial evidence showing that Hospira's cells literally infringed the '349 claims. The jury's verdict to the contrary—based on Hospira's improper claim construction argument—was not supported by substantial evidence. The jury verdict on infringement of the '349 patent is thus neither reasonable nor supported by sufficient evidence.

### 3.      Dr. Hamilton failed to rebut Amgen's infringement evidence

### a.      Dr. Hamilton offered no opinion on infringement

Hospira's expert, Dr. Hamilton, offered: (1) no opinion on whether Hospira's cells infringed the '349 claims; (2) no evidence, by way of either a test result or an alternative calculation, about the rate at which Hospira's cells were capable of producing EPO; and (3) no evidence that Hospira's cells were incapable of producing EPO at the recited rates, as confirmed by the following testimony:

Q:     You're not here to offer an opinion about [whether] Hospira's cells
        actually infringe the '349 claims, are you?

A.     No.

\* \* \*

Q.   So you're not here to tell the jury how many units of EPO Hospira cells can produce, are you?

A.   That's correct.

Q.   You're just here to criticize Dr. McLawhon; is that right?

A.   I'm here to offer an opinion on the calculations that were done by Amgen's experts on the rate of production of EPO from the 151 cells.

Q.   You're not here to tell the jury that Hospira's cells are incapable of producing a hundred units of EPO, are you?

A.   No.

Q.   You're not here to tell us that Hospira's cells are incapable of producing 500 units of EPO?

A.   No.

Q.   Likewise, you're also not here to tell the jury that Hospira's cells are incapable of producing a thousand units of EPO as in the '349 claims?

A.   No.

(Trial Tr. at 1205:18-24; 1208:19-22; 1209:8-1210:6.)

### b.   Dr. Hamilton's attacks on Hospira's own assay cannot support the jury's verdict

Hospira argued that the results of its dot-blot assays (the basis for its admissions to the FDA about the production rates of its cells) were insufficient proof of infringement, based on three issues: (1) they did not use the same EPO standard described in the '349 patent; (2) they did not use the same anti-EPO antibody described in the '349 patent; and (3) they could not be used to calculate the specific activity of the *unpurified* EPO produced by the cells based on the specific activity of a *purified* EPO standard. (Trial Tr. at 1197:8-1198:12.) But Dr. Hamilton failed to tie these alleged deficiencies to any limitation recited in the claims: the '349 claims do not require the same standard or antibody used by Dr. Lin when he tested his inventions, nor are

12

the production-rate limitations limited to testing a purified EPO sample (rather than an unpurified sample).

Dr. Hamilton did not interpret the claims, or opine on whether a person of ordinary skill in the art would have understood the claims to require use of the same EPO standard or anti-EPO antibody preparation that the '349 inventor, Dr. Lin, used. Without a construction that requires the use of Dr. Lin's EPO standard and anti-EPO antibody, Hospira cannot argue that those elements were missing from Amgen's proof of infringement. It was improper for Hospira to suggest to the jury that Hospira's own data, and its admissions about that data, could be negated by such factors *not required* by the claims.

With respect to testing an unpurified sample, Dr. Hamilton admitted that Dr. Lin himself reported the activity of unpurified EPO produced by cells growing in culture, rather than that of purified EPO, in the '349 patent. (Trial Tr. at 1211:10-1212:13.) Dr. Hamilton also admitted that this purified/unpurified issue was not a fatal flaw, and that in fact, a dot-blot assay "can work fine":

> Q.    All right. You testified, I believe you testified that Hospira should have used, for it to be more accurate, Hospira should have used the standard that Dr. Lin used in his patent. Do I have your testimony right?
>
> A.    Well, that wasn't exactly what I was referring to. I was referring to the concern that the crude culture supernatant that contains other than just purified EPO -- or EPO molecules could contain impurities which are also detected, and therefore using a purified standard with a crude culture supernatant is inappropriate. That's a fatal flaw in the reasoning.
>
> Q.    But that's what Dr. Lin did, didn't he?
>
> A.    In some cases, it may work. In this particular case to get an accurate assessment using a dot blot, he used a radioimmunoassay, which is a much more quantitative assay than the dot blot.
>
> Q.    But Dr. Hamilton, you don't think [Dr. McLawhon] committed a fatal flaw, as you called it?

A.    I don't think that was ideal.

Q.    Oh. But it wasn't a fatal flaw?

A.    I think it was a flaw, <u>but obviously in some cases, it can work fine</u>.

(Trial Tr. at 1216:24-1218:3 (emphasis added).) Hospira did not offer any evidence about

whether a dot-blot assay and an RIA would yield a different result for the same sample, much

less any evidence that Hospira's cells, which had an EPO production rate of 3,534 U/10$^6$ cells/48

hours *as determined by a dot-blot assay*, could somehow yield an EPO production rate of less

than 100 U/10$^6$ cells/48 hours *as determined by an RIA*.

Hospira did not offer any evidence as to how much, if any, difference could result from

using an antibody in a dot-blot assay that was different from the antibody described in the '349

patent:

Q.    You made some, you gave some testimony about the antibody or the antiserum that's used. Do you recall that?

A.    Yes.

Q.    Now, with respect to that testimony, you're not actually here to tell us how much or even when that matters to Dr. McLawhon's analysis, are you?

A.    Well, I'm indicating that that is one of the variables between the two assays that differs, and the fact the assays are not cross-compared, one cannot compare the results. The Cotes article makes this very, very clear.

Q.    **What I'm asking you, Dr. Hamilton, is you are not here to tell us how much difference that makes, are you?**

A.    **No.**

(Trial Tr. 1217:22-1218:21 (emphasis added).) Thus, Hospira did not offer *any* evidence to

explain how Dr. Hamilton's criticisms of Hospira's dot-blot results could possibly mean that the

<u>3,534</u> U/10$^6$ cells/48 hours EPO-production rate calculated by Dr. McLawhon is actually 35-fold

smaller, less than the <u>100</u> U/10$^6$ cells/48 hours EPO-production rate recited in '349 claim 1.

## IV.     A NEW TRIAL IS WARRANTED UNDER RULE 59

### A.     The jury's verdict was contrary to the great weight of the evidence

In the alternative to granting judgment as a matter of law, the Court should grant a new

trial on infringement of the '349 claims. Fed. R. Civ. P. 59. "[A] new trial should be granted only

when the verdict is contrary to the weight of the evidence . . . ." *Seachange Int'l., Inc. v. C-Cor,*

*Inc.*, 413 F. 3d 1361, 1368 (Fed. Cir. 2005) (citing *Brennan v. Norton*, 350 F.3d 399, 430 (3d

Cir. 2003)). The Court may grant a new trial, even if it denies JMOL motions, when the verdict

is contrary to the great weight of the evidence. *Roebuck v. Drexel Univ.*, 852 F.2d 715 (3d Cir.

1988).

The jury verdict of non-infringement of the '349 claims is contrary to the weight of the

evidence. As explained above, Drs. Wall and McLawhon provided substantial evidence

establishing that Hospira's cells literally infringed the '349 claims. The '349 claims do not

require that Amgen perform an RIA to prove infringement: as the Federal Circuit held in *Roche*,

a "comparable" test is sufficient. The great weight of the evidence provided by Amgen

established that Hospira's dot-blot assays were comparable to an RIA, and that Hospira's cells

satisfied every limitation in the '349 claims. Consequently, a new trial is warranted.

### B.     Hospira's legally incorrect argument to the jury that the '349 claims require RIA evidence for infringement warrants a new trial

Hospira's counsel's argument to the jury during closing argument that only evidence "as

determined by RIA" falls within the "fence" of the '349 claims, while "outside the fence is dot

blot" (Trial Tr. at 1641:13-23), was legally improper, because it asked the jury to construe the

claims to require evidence produced using an RIA to prove infringement: that is, construing the

claims in such a way that they could never be infringed based on evidence from a dot-blot assay.

The Court never construed the claims in this way, and Hospira never asked for such a construction. Instead, the Court instructed the jury that for any terms for which the Court did not provide a definition, the jury should "give it its ordinary meaning." (Trial Tr. 1549:21-22.)

Hospira presented no evidence at trial that the ordinary meaning of the claims would require RIA evidence to prove infringement. It was improper for Hospira to attempt to introduce a legal construction of the claims during closing argument, when had it sought that construction, the Court would have found, as a matter of law, that Amgen could prove infringement without RIA evidence. *Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340, 1385 (Fed. Cir. 2009) (reversing district court and holding that the production-rate limitations of the '349 claims did not require Amgen "to establish infringement by offering RIA data into evidence").

Accordingly, because Hospira argued an improper claim construction to the jury during closing argument, if the Court does not enter judgment as a matter of law that Hospira infringed the claims, the Court should grant a new trial on the issue of infringement of the '349 patent.

## V.      CONCLUSION

For the foregoing reasons, Amgen respectfully requests that the Court enter judgment as a matter of law under Rule 50(b) that Hospira infringed the '349 claims, or in the alternative, that the Court grant a new trial on infringement of the '349 claims.

16

/s/ Jason J. Rawnsley

*Of Counsel*:

Kevin M. Flowers

Mark H. Izraelewicz

John R. Labbé

Julianne M. Hartzell

Benjamin T. Horton

Douglas G. Bolesch

Yun Wei

MARSHALL, GERSTEIN & BORUN LLP

6300 Sears Tower

233 S. Wacker Drive

Chicago, Illinois 60606-6357

(312) 474-6300

Nicholas Groombridge

Eric Alan Stone

Jennifer H. Wu

Stephen A. Maniscalco

PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP

1285 Avenue of the Americas

New York, New York 10019

(212) 373-3000

Wendy A. Whiteford

Thomas F. Lavery IV

AMGEN INC.

One Amgen Center Drive

Thousand Oaks, CA 91320-1789

(805) 447-1000

Date: October 23, 2017

Robert W. Whetzel (#2288)

Jason J. Rawnsley (#5379)

RICHARDS, LAYTON & FINGER, P.A.

One Rodney Square

920 North King Street

Wilmington, Delaware 19801

(302) 651-7634

whetzel@rlf.com

rawnsley@rlf.com

*Attorneys for Plaintiffs Amgen Inc.
and Amgen Manufacturing, Limited*