IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN INC. and AMGEN MANUFACTURING, LIMITED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 1:15-cv-00839-RGA |
| v. | ) ) | DEMAND FOR JURY TRIAL |
| HOSPIRA, INC., | ) ) ) | |
| Defendant. | ) ) | |

**HOSPIRA'S RESPONSE BRIEF IN OPPOSITION TO AMGEN'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OF INFRINGEMENT OF THE '349 PATENT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

OF COUNSEL:
WILLKIE FARR & GALLAGHER LLP
Thomas J. Meloro
Michael W. Johnson
Heather M. Schneider
Dan Constantinescu
M. Diana Danca
Tara L. Thieme
Philip F. DiSanto
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Dated: November 20, 2017

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

Dominick T. Gattuso (# 3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Hospira, Inc.*

**TABLE OF CONTENTS**

I. INTRODUCTION ...........................................................................................................1

II. LEGAL STANDARDS ...................................................................................................2

    A. Standards For JMOL................................................................................................2

    B. Standards For New Trial ..........................................................................................3

III. AMGEN IS NOT ENTITLED TO JMOL BECAUSE HOSPIRA INTRODUCED AMPLE EVIDENCE FOR THE JURY TO FIND NONINFRINGEMENT .....................4

    A. Amgen Did Not Establish That Hospira's Cells Infringe The '349 Patent..............4

    B. A Reasonable Jury Could Find That Hospira Does Not Infringe ............................7

        1. Hospira Did Not Admit That Its Cells Were Capable Of Producing EPO At The Claimed Production Rates.........................................................7

        2. Hospira Never Argued That The Claims Exclude Using An Assay Other Than RIA, But Argued That Amgen's Evidence Was Deficient...................................................................................................9

        3. Dr. Hamilton Soundly Rebutted Amgen's Infringement Evidence ...........11

IV. AMGEN IS NOT ENTITLED TO A NEW TRIAL BECAUSE THE VERDICT IS SUPPORTED BY THE EVIDENCE AND HOSPIRA DID NOT MAKE LEGALLY INCORRECT ARGUMENTS......................................................................14

    A. The Jury's Verdict Of Noninfringement Is Supported By The Evidence..............14

    B. Hospira Did Not Argue At Trial That Dot Blot Could Never Be Used To Prove Infringement ................................................................................................15

V. CONCLUSION..............................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                          **Pages**

*Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980)..................................................................3

*Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340 (Fed. Cir. 2009) .......................9, 10, 15

*Eshelman v. Agere Sys.*, Inc., 554 F.3d 426 (3d Cir. 2009) ...............................................................3

*Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171 (3d Cir. 1976) ..................................3

*Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562 (Fed. Cir. 1997).....................................................10

*Marra v. Phila. Hous. Auth.*, 497 F.3d 286 (3d Cir. 2007)................................................................2

*Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282 (3d Cir. 1993)....................................3

*Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888 (Fed. Cir. 1984) ...............................2

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344 (3d Cir. 1991) ................................................2, 3

*Zarow-Smith v. NJ Transit Rail Operations, Inc.*, 953 F. Supp. 581 (D.N.J. 1997).........................3

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418 (Fed. Cir. 1994).............................10


**Rules**                                                                                                                          **Pages**

Fed. R. Civ. P. 50(a)(l)........................................................................................................................2

Fed. R. Civ. P. 59(a)(l)(A) .................................................................................................................3

Hospira submits this Opposition to Amgen's Renewed Motion for Judgment as a Matter of Law of Infringement of the '349 Patent or, in the Alternative, for a New Trial. (D.I. 356.)

## I. INTRODUCTION

The issue here is straightforward—Amgen put in "circumstantial evidence" that Hospira's cells are capable of producing EPO at the claimed rates as determined by RIA, and the jury simply did not credit it. On the other hand, Hospira presented more than sufficient evidence from which a jury could properly conclude that Hospira does not infringe.

Hospira's expert Dr. Hamilton, an undisputed expert in RIA who worked with the Nobel-Prize winning creator of that assay, explained that the claims specify RIA, that Hospira's cells were not tested using RIA, and that the dot blot assay relied on by Amgen does not prove infringement. Amgen did not present any evidence that the dot blot and RIA provide comparable results. In contrast, Dr. Hamilton explained the multiple differences between the two tests: (1) the dot blot from Hospira's BLA was run on a crude EPO sample; (2) one cannot rely on the specific activity of purified EPO; and (3) the dot blot did not use the same standard or antibody/antiserum as the '349 patent. Amgen's expert, Dr. McLawhon, confirmed that the dot blot was run on a crude EPO sample and that less specific antibodies will potentially react with all contents of the crude sample. Dr. Joan Egrie, the Amgen employee who performed the RIA for the '349 patent, testified that it is important to use the same standard when making a comparison between assays because the standard sets the potency. Published literature confirms that it is necessary to validate each new assay because of the difference in antibody/antiserum. The jury was entitled to credit Hospira's evidence and find noninfringement and there is no basis to upset that verdict or grant judgment as a matter of law ("JMOL") to Amgen.

There is also no basis to grant a new trial. Amgen's after-the-fact claim construction arguments are not supported by the record. Hospira never argued at trial that Amgen could *never*

1

prove infringement using dot blot; Hospira simply argued, correctly, that Amgen's evidence was insufficient.  Dr. Hamilton spent much of his testimony discussing the weaknesses of the dot blot evidence, but he never testified that any "claim construction" precluded it.  In its closing argument, Hospira correctly noted that the claims specify RIA and that Amgen's lawyers chose those words to define the "deed" of their property, but Amgen did not present any RIA data and its dot blot data was not good enough to prove infringement.  Just because the jury believed Hospira and not Amgen is no basis for a new trial.  Amgen's motion should be denied.

## II. LEGAL STANDARDS

### A. Standards For JMOL

JMOL is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue.  Fed. R. Civ. P. 50(a)(l).  "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted).

In assessing the sufficiency of the evidence, the Court must give the nonmovant, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him."  *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991).  The Court may "not determine the credibility of the witnesses [nor] substitute its choice for that of the jury between conflicting elements in the evidence."  *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).  Rather, the Court must determine whether the evidence reasonably supports the jury's verdict.  In making that determination, "[t]he question is not whether there is literally no evidence supporting the unsuccessful party, but

whether there is evidence upon which a reasonable jury could properly have found its verdict." *Eshelman v. Agere Sys.*, Inc., 554 F.3d 426, 433 (3d Cir. 2009) (citing *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)).

Where the movant bears the burden of proof, the Third Circuit applies a stricter standard. *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976). To grant JMOL in favor of a party that bears the burden of proof on an issue, the Court "must be able to say not only that there is sufficient evidence to support the [movant's proposed] finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding." *Id.* (citation omitted).

### B.     Standards For New Trial

Fed. R. Civ. P. 59(a)(l)(A) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Zarow-Smith v. NJ Transit Rail Operations, Inc.*, 953 F. Supp. 581, 584-85 (D.N.J. 1997).

The decision to grant a new trial is committed to the sound discretion of the district court. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993). A new trial should only be granted "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson*, 926 F.2d at 1353.

## III. AMGEN IS NOT ENTITLED TO JMOL BECAUSE HOSPIRA INTRODUCED AMPLE EVIDENCE FOR THE JURY TO FIND NONINFRINGEMENT

### A. Amgen Did Not Establish That Hospira's Cells Infringe The '349 Patent

Amgen only asserted literal infringement of the '349 patent. (Pretrial Conf. Tr. at 12:12-15, Sept. 8, 2017.) Hospira sought to preclude Amgen from relying on dot blot data to prove literal infringement. (D.I. 290, Pretrial Order, Ex. 13, Motion in Limine No. 2.) Amgen opposed the motion, arguing that it should be able to use dot blot data as "circumstantial evidence" because data from a "comparable" test could satisfy the RIA limitation. (Amgen Opp. at 1-2.) Amgen asserted that it would provide evidence that the two tests yield "very similar, if not identical" results. (*Id.* at 3.) The Court denied Hospira's motion and let Amgen proceed.

Amgen presented its circumstantial evidence at trial, but the jury did not credit it. Amgen's experts admitted that they did not perform or consider any RIA testing of the accused cells. (Trial Tr. 283:5-7; 287:24-288:4; 523:9-11; 537:2-19.) Even accepting Amgen's position that another test could satisfy the RIA limitation, Amgen still needed to show that the accused cells were "capable of" achieving the claimed production rates "as determined by radioimmunoassay." (PTX-001, col. 38:8-36).[1] Amgen attempted to prove infringement by calculating production rates from the dot blot in Hospira's BLA, and arguing that Hospira's cells were capable of achieving the rates as determined by RIA. But Amgen never established the comparability between dot blot and RIA that it proffered in response to Hospira's motion.

No reasonable jury could find that Hospira's accused cells are "capable of" achieving the recited EPO production rates "as determined by radioimmunoassay" based on Amgen's purported calculations. Dr. Wall provided *no* testimony that RIA and dot blot yield similar results. Rather, he testified that he relied on Dr. McLawhon's opinions regarding RIA. (Trial

---

[1] Trial Exhibits cited herein are included in an Appendix being filed concurrently herewith.

4

Tr. 271:5-22; 275:19-276:23.) Although Dr. McLawhon could have tested Hospira's EPO using an RIA, he did not. (*Id.*, 537:20-538:17.) He relied on the dot blot, but provided *no* testimony about whether dot blot and RIA yield similar results. He testified that the dot blot assay was used to determine the rate of EPO production in mass (µg/mL). (*Id.*, 525:8-17.) But he never presented any evidence that dot blots produce results similar or comparable to RIA.

Unlike Dr. Hamilton, Dr. McLawhon never explained how the dot blot works or how it compares to an RIA. He simply took the content in mass and converted it to "units" like a "currency converter." (*Id.*, 528:1-529:24.) He admitted that the standard he used for the conversion contains "very minute quantities" of "highly purified" EPO. (*Id.*, 530:15-22.) In contrast, the EPO in the dot blot reported in Hospira's BLA comes from a "broth" that has not yet been purified and will be subject to a lot more processing before it is given to people. (*Id.*, 539:9-540:16.) That broth, called the "supernatant," has imperfect forms of EPO that never end up in Hospira's final product. (*Id.*, 541:5-542:5.) Dr. McLawhon does not know whether the same antibody was used in the standard he used for the conversion and the dot blot, although he admits that should be done if one is going to make a comparison and that he would have known which antibody was used if he had run the experiment. (*Id.*, 545:3-546:2.)

Amgen attempts to overcome these holes in its evidence by improperly shifting the burden to Hospira. Amgen says that Hospira failed to introduce any affirmative testing that its cells could not meet the claimed rates. However, the burden to prove literal infringement rests on Amgen and the jury was instructed as such. (*Id.*, 107:15-21; 1545:10-16.) Hospira introduced more than sufficient evidence to rebut Amgen's speculation that the cells infringe. Dr. Hamilton provided unrebutted testimony that dot blot and RIA are different assays and that dot blot is a semi-quantitative and less accurate assay, which does not prove infringement. (*Id.*,

5

1193:18-1194:8; 1198:5-12; 1191:5-13.) He also provided several reasons why the two tests do not yield similar results. First, the dot blot assay measures production rates in terms of mass and not units ("U"), as specified in the claims. (*Id*., 1193:1-6; 1195:17-21.) Second, the sample tested in the dot blot assay was not purified and this can lead to an overestimation of the production rate. (*Id*., 1196:4-1197:7.) Third, the same standard should be used when comparing results from two different assays. (*Id*., at 1197:24-1198:4.) Fourth, the antiserum used in the assays must be validated independently to show similarity in results. (*Id*., 1198:13-1199:18.)

Dr. Egrie, a former Amgen scientist who conducted the RIA testing on the EPO project, confirmed that the same standard should be used when comparing different assays:

> Q: Okay. So if I had a hundred units in my RIA, but I use one reference standard, and you had a hundred units in yours, which uses a difference standard, they might not actually contain the same amount of EPO, EPO activity; right?
>
> A: If you wanted to make a comparison, you should use the same standard.
>
> ...
>
> Q: Okay. And why would it be important to use the same reference standard in order to be able to make the comparisons?
>
> A: That's just obvious.
>
> Q: I'm slow, can you help me why that's obvious?
>
> A: Because that is what sets your potency, is your standard.

(*Id*., 1163:5-24.) Dr. Lin, the inventor of the '349 patent, confirmed that Dr. Egrie and her research team performed the RIA testing on EPO. (*Id*., 245:11-24).

Thus, even if Amgen could theoretically show that Hospira's cells are "capable of" producing the recited number of units "as determined by" RIA, Amgen failed to do so because it introduced no evidence that EPO production rates as determined by dot blot are similar to or representative of EPO production rates as determined by RIA. Amgen failed to present

6

sufficient evidence from which a reasonable jury could find literal infringement of any of the asserted claims of the '349 patent. In contrast, Hospira presented sufficient evidence from which a jury could find noninfringement. Thus, Amgen's renewed motion for JMOL should be denied.

### B. A Reasonable Jury Could Find That Hospira Does Not Infringe

Amgen ignores the weight of the evidence and comes up with three novel and incorrect arguments in its JMOL motions. First, Amgen says that Hospira "admitted" its production rate in materials submitted to FDA and now is disputing its own FDA submissions—that is not true. Second, Amgen argues that Hospira's closing argument somehow raised a new claim construction argument simply because Hospira put the words of the claims on a slide—that is nonsensical. Third, Amgen argues that Dr. Hamilton failed to rebut Amgen's infringement evidence. To the contrary, Dr. Hamilton presented numerous, unrebutted opinions that the jury could credit to find noninfringement. Amgen's arguments are incorrect as discussed below.

#### 1. Hospira Did Not Admit That Its Cells Were Capable Of Producing EPO At The Claimed Production Rates

Hospira's BLA contained rough information that some of the vertebrate cells tested could produce 100 µg of EPO per mL of cell-culture medium. (PTX-293-0028.) This is at most what Hospira "admitted" at trial. However, Hospira did *not* admit that its cells were capable of producing EPO at rates "in excess of 100 [or 500, or 1000] U" of EPO "as determined by radioimmunoassay." Hospira's alleged admissions do not support Amgen's infringement contentions. Contrary to Amgen's argument, converting from mass units to biological activity units as measured in the claims is not like converting currency because these units are not standardized like money. Even if a daily production rate as measured in mass units could be converted into biological activity units, the conversion must be done using the appropriate sample and a validated standard. As Dr. Hamilton testified, the units ("U") in the '349 patent are

7

biological activity units (Trial Tr. 1187:6-10), and this testimony was never rebutted. Dr. McLawhon ignores this fact and just converts from mass to U without acknowledging the difference. (*Id.*, 525:1-526:11; 1187:2-5.) As Dr. Hamilton testified, the only way µg/mL could possibly be converted into U was if the EPO was "purified out." (*Id.*, 1213:24-1214:3.) That was not done here, as Dr. McLawhon admitted during his testimony. (*Id.*, 544:24-545:2.)

Dr. Hamilton did not testify that the "admissions" in Hospira's FDA submission were wrong. He explained that the dot blot was done as a rough measure of the amount of EPO. (*Id.*, 1193:18-1194:8). The purpose was just to see which cell lines were producing EPO. (*Id.*, 1212:14-24) However, for the reasons Dr. Hamilton explained, the results of Hospira's dot blot assay are not reliable for measuring "U" as required by the claims, and do not accurately assess the level of biologically active EPO in the sample:

> So the standard was different, the antibodies were different, the assay design was different, the relative degree of quantitation was different, and based on all of those variables, one can't accurately assess the level of EPO in a culture supernatant cell preparation, which is really what the claims 1 through 6 in the patent are requiring.

(Trial Tr. 1198:5-12.)

First, a sample taken directly from the supernatant, as done in the dot blot assay, will likely contain biologically inactive impurities and EPO fragments that indiscriminately bind to the antibody, and thus will not be an appropriate sample to use in the conversion calculation. (*Id*. 1196:10-20.) In fact, it is undisputed that the sample tested in the dot blot in Hospira's BLA, which has not been subjected to Hospira's extensive purification process, is not the same EPO that will be sold under Hospira's BLA. (*Id.*, 1225:3-18.) Second, the use of a purified standard to quantify the amount of EPO in the crude sample is not appropriate. (*Id.*, 1197:8-13.) Lastly, in his calculations, Dr. McLawhon used the standard that was used in Hospira's BLA. (*Id.*,

8

525:1-526:8; 528:16-21.) As the transcript reflects, Dr. McLawhon never discussed the details of the two assays to show that they were similar or even comparable. (*Id.*, 525:1-536:11.) His focus was solely on converting the mass units from the Hospira's dot blot into U "units to be comparable to the '349" patent. (*Id.*, 532:17-533:8.) However, as previously mentioned, Dr. Egrie, the Amgen scientist who performed the RIA testing for the '349 patent, testified that, for an accurate comparison between two different assays, the same standard should be used. (*Id.*, 1163:5-24.) Dr. Hamilton testified that the standards used in the '349 patent and in Hospira's BLA were not the same. (*Id.*, 1197:24-1198:4.) Thus, this comparison is inaccurate.

Dr. Hamilton effectively explained why Amgen's calculations failed to prove that Hospira's cells were capable of producing EPO "in excess of 100 [or 500, or 1000] U" of EPO "as determined by radioimmunoassay." It was Amgen's burden to prove infringement. Dr. Hamilton was not required to calculate a production rate himself to prove that Hospira's cells were not capable of producing EPO at the claimed rates. Indeed, the whole point of Dr. Hamilton's testimony is that such a calculation could not be done with the available information. The jury was entitled to credit Dr. Hamilton's testimony to find noninfringement.

        **2.**      **Hospira Never Argued That The Claims Exclude Using An Assay Other Than RIA, But Argued That Amgen's Evidence Was Deficient**

Amgen argues in its JMOL motion that RIA results are not necessary to show that Hospira's cells literally infringe the claims of the '349 patent. Amgen's argument is based on the ruling in a prior case, *Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340, 1385 (Fed. Cir. 2009). In *Roche*, Amgen asserted infringement based on RIA, a different "ELISA" test, and under the doctrine of equivalents ("DOE"). Amgen could have tried to establish that RIA and dot blot are substantially similar based on their function, way, and result had it asserted infringement under the DOE. However, Amgen only asserted literal infringement, and thus

9

Amgen took on the burden of showing that the dot blot and the RIA were comparable or yield "very similar, if not identical" results. *Id*.

The flaw in Amgen's JMOL argument is that neither Hospira nor Dr. Hamilton ever argued at trial that Amgen was legally precluded from establishing infringement through dot blot. Rather, each pointed out that the dot blot data was inadequate. That is a perfectly fair argument for Hospira to make, and is entirely consistent with the *Roche* case and other case law on point. The *Roche* case just said that the issue of infringement could go to the jury. *Id.* at 1386. That is what happened here—Amgen took its case to the jury, and the jury disagreed.

Hospira's arguments are consistent with other case law on testing as well. When determining if a patent claim is literally infringed, "the scientific theories utilized must establish the presence of the limitations recited in the claim." *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994). Similarly, the Federal Circuit upheld non-infringement where a patentee claimed specific "characteristics that would later control the nature of the evidence necessary to prove infringement," but "failed to show that every limitation of the claims it chose to prosecute was present in [the] allegedly infringing composition." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1566 (Fed. Cir. 1997). Like the patentees in *Zenith* and *Glaxo*, Amgen drafted its claims to require particular evidence of infringement—that the cells were capable of producing a certain number of U as determined by RIA—and therefore, to prove infringement, it must provide reliable evidence to meet that limitation. Amgen did not.

Amgen points out that the jury was instructed that it could rely on circumstantial evidence and that the law does not favor direct evidence over circumstantial evidence. (Trial Tr. 111:13-112:13, 1536:24-1537:23.) But just because circumstantial evidence is allowed, does not mean the jury has to credit it. Here, Amgen never introduced sufficient evidence to prove literal

infringement based on the dot blot assay results. Dr. Wall never performed any RIAs or any other tests on Hospira's cells. (*Id.*, 283:5 -7; 284:5-18.) In fact, Dr. Wall testified that he does not know how to run any EPO RIAs at all, and thus Amgen did not ask him to run an EPO RIA. (*Id.*, 287:24-288:4.) His infringement opinion relied solely on the calculations performed by Dr. McLawhon. (*Id.*, 276:15-23.) In turn, Dr. McLawhon also admitted that he never performed any tests on Hospira's cells and that instead he performed calculations using the data reported in Hospira's BLA. (*Id.*, 523:9-16.) Via testimony from Dr. Hamilton, Hospira showed that Dr. McLawhon improperly converted the dot blot results into biological activity units and thus this circumstantial evidence was insufficient to prove literal infringement. Thus, the jury's verdict of noninfringement of the '349 patent was reasonable and supported by the evidence.

        **3.     Dr. Hamilton Soundly Rebutted Amgen's Infringement Evidence**

              **a.     Dr. Hamilton *Did* Offer An Opinion On Infringement—Which Was That Amgen's Evidence Was Deficient**

Amgen maintains that Dr. Hamilton failed to rebut its literal infringement evidence of the '349 patent because he offered: (1) no opinion on whether Hospira's cells infringed the '349 patent; (2) no evidence on Hospira's cells' rate of production; and (3) no evidence that the cells were incapable of producing EPO at the claimed rates. In Amgen's view, Dr. Hamilton "offered no opinion on infringement" because he did not make these points.

Amgen's argument misstates Dr. Hamilton's testimony. Dr. Hamilton *did* offer a lengthy and detailed opinion on the subject of infringement—which was that Amgen's evidence did not pass muster. Dr. Hamilton was not required to offer the kind of affirmative evidence that Amgen suggests. Amgen has the burden of proof to show that Hospira's cells are capable of producing EPO at the rates recited in the claims of '349 patent. Amgen did not meet that burden. As Dr. Hamilton pointed out, Amgen offered no evidence of RIA results to show that Hospira's cells

11

were capable of the production rates recited in the claims of the '349 patent as determined by RIA. (Trial Tr. 1190:13-1191:4.) Next, Dr. Hamilton testified that the dot blot assay and the RIA are not similar for several reasons as previously described. (*Id.*, 1196:2-1198:12.) Hospira did not have to "prove" noninfringement, especially when Amgen's proof was so deficient.

### b. Dr. Hamilton's Critiques Of The Dot Blot Assay Support The Jury Verdict

Amgen's next argument is that Dr. Hamilton "attacked" the dot blot assay Hospira included in its BLA. That is wrong. Dr. Hamilton did not criticize Hospira's use of the dot blot assay to look for the presence or absence of EPO; he merely pointed out that it is only a semi-quantitative assay and is a very inaccurate and insensitive assay for measuring the exact quantity of EPO. (Trial Tr. 1193:1-1194:8.) Dr. Hamilton pointed out the flaws of Amgen's attempt to convert mass units from the dot blot into biological activity units as measured by RIA. First, Dr. Hamilton repeatedly stated that the dot blot is not a radioimmunoassay but rather a qualitative assay and less accurate than the RIA. (*Id.*, 1193:18-24.) Next, he pointed out the reasons why it was not proper to convert the dot blot results from mass units to biological activity units: (1) the dot blot assay used an unpurified sample whereas the standard used was a purified sample of EPO; (2) the dot blot assay and the RIA in the '349 patent did not use the same standard; and (3) the dot blot and the RIA in the '349 patent did not use the same antibody. (*Id.*, 1197:8-1198:12.)

Amgen alleges that Dr. Hamilton failed to tie these deficiencies to the claims of the '349 patent because the claims do not specify the standard or antibody used by Dr. Lin when he tested the production rates, and they do not specify the purity, or lack thereof, of the sample being tested. However, as Dr. Hamilton pointed out, different standards will produce different results, and so in order to make an accurate comparison, the same standard should be used. (*Id.*, 1197:8-

12

1198:4.) Indeed, as previously mentioned, Dr. Egrie testified that to achieve a meaningful comparison, the same standard should be used. (*Id.*, 1163:5-24.)

Amgen attempted to discredit Dr. Hamilton's argument regarding the purity of the dot blot sample by pointing out that Dr. Lin, in the '349 patent, did not purify the EPO sample before running an RIA. However, Dr. Hamilton responded that Dr. Lin ran a radioimmunoassay, not a dot blot, and thus Dr. Lin was not trying to compare pure to impure samples across two different assays as Amgen is doing here. (*Id.*, 1216:24-1217:21.) As the transcript reflects, Dr. Hamilton testified that *Dr. Lin* did not commit a fatal flaw in running a radioimmunoassay on an impure sample (although it was not ideal). (*Id.*, 1217:22-1218:3.) In its opening brief, Amgen argued that Dr. Hamilton testified that *Dr. McLawhon* did not commit a fatal flaw when he used an unpurified sample from the dot blot assay to perform his calculations, which is clearly incorrect. (D.I. 358, Amgen Op. Brief at 13.) More importantly, Dr. Hamilton testified that the '349 patent examples use a standard curve. (Trial Tr. 1226:3-23.) This was not surprising, as Dr. Lin's lab did a lot of work on EPO and compared their results to a standard curve; but that curve was not compared to Hospira's sample in this case. (*Id.*, 1227:21-1228:10.) This lack of comparability is yet another reason that the dot blot from Hospira's BLA does not prove infringement.

Amgen also attempts to discredit Dr. Hamilton's testimony regarding the use of different antibodies. Amgen criticizes Dr. Hamilton for not quantifying the effect different antibodies can have on the results of the assay. First of all, Dr. Hamilton and Hospira do not have the burden of calculating the effect of using different antibodies. Second, Dr. Hamilton points out that the antibody is only one of the variables between the two assays. Lastly, he reiterates that only validated assays can be compared. That is in agreement with the published literature. (*Id.*, 1218:4-1218:21.) Even Dr. McLawhon agrees that the same antibodies should be used if a

13

comparison is made. (*Id.*, 543:24-545:9.) A reasonable jury could have credited Dr. Hamilton's testimony to find noninfringement at trial. Thus, Amgen's motion should be denied.

## IV. AMGEN IS NOT ENTITLED TO A NEW TRIAL BECAUSE THE VERDICT IS SUPPORTED BY THE EVIDENCE AND HOSPIRA DID NOT MAKE LEGALLY INCORRECT ARGUMENTS

### A. The Jury's Verdict Of Noninfringement Is Supported By The Evidence

The jury's verdict of noninfringement of the '349 patent is well supported by the evidence presented at trial. Dr. McLawhon, who had performed thousands of EPO RIAs in the past, did not perform an RIA or a dot blot assay to show that Hospira's cells met the limitations of the '349 patent claims. (Trial Tr. 519:20-24; 537:9-11.) Instead, he relied on the dot blot results in Hospira's BLA. (*Id.*, 537:12-19.) He improperly converted the dot blot assay results into biological activity units without testifying as to *why* the dot blot assay and the RIA are similar or comparable. Dr. Wall, Amgen's other expert in this area, presented no evidence that he performed any assays, whether RIA or dot blot, to show that the '349 patent claims were infringed. (*Id.*, 287:20-288:19.) His infringement opinion regarding Hospira's cells' production rates relied solely on the purported calculations performed by Dr. McLawhon. (*Id.*, 276:15-23.) He also did not testify how the two assays are similar or comparable. (*Id.*, 275:19-276:14.)

In contrast, Dr. Hamilton presented several reasons why the two tests are not comparable and pointed out the deficiencies in Amgen's calculations: (1) the dot blot assay used an unpurified sample whereas the standard used in Amgen's calculations was a purified sample of EPO; (2) the dot blot assay and the RIA in the '349 patent did not use the same standard; and (3) the dot blot and the RIA in the '349 patent did not use the same antibody. (*Id.*, 1197:18-1198:12.) As such, Hospira successfully rebutted Amgen's evidence of literal infringement of the '349 patent. Thus, the jury's verdict is supported by the evidence presented at trial and a new trial is not warranted.

14

### B. Hospira Did Not Argue At Trial That Dot Blot Could Never Be Used To Prove Infringement

Amgen argues that Hospira made an improper argument to the jury when it depicted the RIA "within the fence" of the '349 patent claims and the dot blot assay "outside the fence" of the '349 patent. (*Id*., 1641:11-1642:6.) Amgen maintains that Hospira asked the jury to construe the claims, which is a legal issue determined by the courts. But Hospira did not ask the jury to make a claim construction decision. Hospira merely pointed out, correctly, that "as determined by radioimmunoassay" is literally recited in the claims; those are the words selected by Amgen's lawyers to describe the invention. (*Id.*, 1639:8-1640:4.) As Hospira's counsel pointed out, Dr. Hamilton testified that the dot blot was not good enough, for a variety of reasons. (*Id*., 1641:22-1643:24.) The jury was entitled to credit Dr. Hamilton's testimony.

Hospira's counsel never said that dot blot could not be used or that circumstantial evidence was not allowed. In fact, the jury received instructions both at the beginning and at the end of the trial that in the absence of direct evidence, circumstantial evidence should be considered. (*Id.*, 111:11-112:13; 1536:24-1537:23.) Amgen attempts to rely on the *Roche* case, where the Federal Circuit allegedly held that Amgen may prove literal infringement without RIA evidence (although Amgen had asserted DOE as well). *Amgen Inc. v. F. Hoffmann-La Roche Ltd*., 580 F.3d 1340, 1385 (Fed. Cir. 2009). The *Roche* case does not provide any support for having a new trial because it merely held that Amgen could present its evidence to a jury—it did not say the jury had to rule in Amgen's favor. The jury heard the circumstantial evidence presented by Amgen here, *i.e.*, the dot blot results, and found no literal infringement.

### V. CONCLUSION

For the foregoing reasons, Hospira respectfully requests that the Court deny Amgen's motions for JMOL under Fed. R. Civ. P. 50(b) and for a new trial under Fed. R. Civ. P. 59.

15

OF COUNSEL:

WILLKIE FARR & GALLAGHER LLP
Thomas J. Meloro
Michael W. Johnson
Heather M. Schneider
Dan Constantinescu
M. Diana Danca
Tara L. Thieme
Philip F. DiSanto
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Dated:  November 20, 2017

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

 /s/ Dominick T. Gattuso
Dominick T. Gattuso (# 3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Hospira, Inc.*

16