IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC. and AMGEN MANUFACTURING, LIMITED,<br><br>　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>HOSPIRA, INC.,<br><br>　　　　　　Defendant. | C.A. No. 1:15-cv-00839-RGA<br><br>DEMAND FOR JURY TRIAL |

**DEFENDANT HOSPIRA, INC.'S OPPOSITION TO
AMGEN'S MOTION FOR PREJUDGMENT AND POST-JUDGMENT INTEREST**

OF COUNSEL:
WILLKIE FARR & GALLAGHER LLP
Thomas J. Meloro
Michael W. Johnson
Heather M. Schneider
Dan Constantinescu
M. Diana Danca
Tara L. Thieme
Philip F. DiSanto
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Dated: November 20, 2017

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

Dominick T. Gattuso (# 3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Hospira, Inc.*

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. PREJUDGMENT INTEREST..............................................................................................3

    A. The Purpose of Prejudgment Interest Is To Make The Plaintiff Whole, Not To Punish The Defendant. ........................................................................................3

    B. In The Unique Circumstances Of This Case, Interest Should Be Calculated From The Date Each Infringing Batch Was Made. ................................................5

    C. The Prime Rate Should Not Be Used As An Inflated Proxy Where Amgen's Actual Borrowing Rate Is Known............................................................9

    D. The Court Should Adopt Hospira's Proposed Prejudgment Interest. .....................11

III. POST-JUDGMENT INTEREST .......................................................................................12

    A. The Court's September 25, 2017 Judgment Marks the Date on Which Post-judgment Interest Begins to Accrue. .............................................................13

    B. Post-Judgment Interest Does Not Accrue On Prejudgment Interest Until An Order Quantifying Prejudgment Interest Is Entered. .......................................14

IV. CONCLUSION....................................................................................................................15

## TABLE OF AUTHORITIES

**Cases**                                                                                                                         **Pages**

*Bio-Rad Lab., Inc. v. Nicolet Instrument Corp.*,
    807 F.2d 964 (Fed. Cir. 1986) ................................................................................. 7, 10

*Eaves v. County of Cape May*,
    239 F.3d 527 (3d Cir. 2001) ......................................................................................... 13

*Gen. Motors Corp. v. Devex Corp.*,
    461 U.S. 648 (1983) ................................................................................................ 3, 4, 7

*Hockerson–Halberstadt, Inc. v. Propet USA, Inc.*,
    62 Fed. App'x 322 (Fed. Cir. 2003) ............................................................................. 3, 4

*IMX, Inc. v. LendingTree LLC*,
    469 F. Supp. 2d 203 (D. Del. 2007) ............................................................................. 4, 9

*Joy Technologies, Inc. v. Flakt, Inc.*,
    954 F. Supp. 796 (D. Del. 1996) ...................................................................................... 4

*Laitram Corp. v. NEC Corp.*,
    115 F.3d 947 (Fed. Cir. 1997) ........................................................................................ 10

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
    998 F.2d 1144 (3d Cir. 1993) ......................................................................................... 13

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996) ..................................................................................... 3, 7

*Phillips Petroleum Co. v. Rexene Corp.*,
    No. Civ. A. 90-208, 1997 WL 781856 (D. Del. Sept. 4, 1997) ........................................... 4

*Rocket Jewelry Box, Inc. v. Quality Intern. Packaging, Inc.*,
    403 F.Supp.2d 288 (S.D.N.Y. 2005) ............................................................................. 4, 5

*Skretvedt v. E.I. Dupont de Nemours*,
    372 F.3d 193 (3d Cir. 2004) ..................................................................................... 13, 14

*Slater v. Texaco, Inc.*,
    506 F. Supp. 1099 (D. Del. 1981) .............................................................................. 4, 10

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
    862 F.2d 1564 (Fed. Cir. 1988) .................................................................................... 4, 9

*Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*,
    No. 78-114, 1990 WL 293886 (D. Or. Sept. 19, 1990) ................................................. 4, 8

*Travelers Cas. and Sur. Co. v. Ins. Co. of N. Am.*,
    609 F.3d 143 (3d Cir. 2010)......................................................................................14


**Statutes**                                                                                             **Pages**

28 U.S.C. § 1961................................................................................................................12

35 U.S.C. § 284..................................................................................................................3

**I.     INTRODUCTION**

1.     Amgen sued Hospira for infringing two expired patents, U.S. Patent Nos. 5,756,349 (the "'349 patent") and 5,856,298 (the "'298 patent") based on the manufacture of twenty-one batches of erythropoietin ("EPO") drug substance. To date, Hospira has not received FDA approval or sold its proposed EPO product, and Amgen has suffered no economic harm as a result of Hospira's manufacture of EPO. Nevertheless, after a five-day trial, the jury rendered a verdict on September 22, 2017, finding that Hospira infringed claims 24 and 27 of the '298 patent. The jury found that seven of the twenty-one batches were protected by the Safe Harbor, and awarded $70 million in damages for the remaining fourteen batches. (D.I. 326.)

2.     Amgen now asks this Court to award four years of interest for damages on expired patents where Hospira has not sold a single infringing product. Amgen's methods for calculating prejudgment interest are fatally flawed because they assume a royalty would have been paid on EPO batches well before they even existed and because they assume a baseless interest rate that creates a windfall for Amgen, rather than simply making Amgen whole.

3.     Determining the amount of prejudgment interest, if any, is within the Court's discretion. In reaching an appropriate amount here, there are two main factors to consider: (1) whether the interest should be calculated on a per-batch basis or as a lump sum; and (2) what interest rate should be used to make Amgen whole. These factors are addressed below and in the Declaration of Gregory K. Bell, Ph.D., filed herewith.

4.     First, any interest should be calculated on a per-batch basis, rather than a lump-sum basis, to reflect incremental payments each time a batch of drug substance was manufactured. Although some courts apply interest from the first act of infringement, that does not make sense under the particular circumstances of this case. This case involves one of the

first BPCIA litigations, with discrete acts of manufacture that occurred on identifiable dates, in an evolving regulatory landscape where there was significant uncertainty on the application of the Safe Harbor defense. In these circumstances, it would be improper to charge interest on batches before they were created.

5. Second, the Court should not apply the prime rate because it is not supported by any evidence and would create a windfall for Amgen. Although courts in this District sometimes use the prime rate as proxy for the plaintiff's borrowing rate, using that proxy here would be improper because it does not reflect the rate at which Amgen borrowed money. The Court should use Amgen's actual average borrowing rate as supported by Amgen's public financial documents. A financially sound company such as Amgen was not paying the prime rate on loans at this time, and in fact Amgen's 10-Ks show loans at rates significantly below the prime rate. Using Amgen's average debt rate on a per-batch basis, rather than a lump-sum basis, yields prejudgment interest of $4,843,892 which restores Amgen to the position it would have been in had Hospira taken a license. Granting Amgen's request for over twice that amount would be an abuse of discretion.

6. With respect to post-judgment interest, Amgen impermissibly inflates its award by failing to use the date of judgment, September 25, 2017 (D.I. 326), as the start date for post-judgment interest and the cutoff for prejudgment interest. Amgen's brief ignores Third Circuit law, which specifies that post-judgment interest begins to accrue on a non-final judgment so long as that judgment sets forth a fixed amount for the prevailing party. Here, the judgment entered on September 25, 2017 specified a fixed dollar amount, and triggered the switch from pre- to post-judgment interest. In addition, in the Third Circuit, post-judgment interest on any

prejudgment interest does not accrue until the prejudgment interest amount is determined. The Court should deny Amgen's request to the contrary.

## II. PREJUDGMENT INTEREST

### A. The Purpose of Prejudgment Interest Is To Make The Plaintiff Whole, Not To Punish The Defendant.

7. Prejudgment interest may be awarded "to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983); *see also* 35 U.S.C. § 284. However, the Supreme Court emphasized that the purpose of prejudgment interest was purely compensatory and was not intended to punish the defendant or provide a windfall to the plaintiff. *See id.* at 655–56 (stating that prejudgment interest "merely serves to make the patent owner whole" because the plaintiff has "foregone [the] use of the money between the time of infringement and the date of the judgment"). Contrary to Amgen's assertion that awarding prejudgment interest "is the rule," such interest is not mandatory, and the Court may, in its discretion, "limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit," as well as in "other circumstances in which it may be appropriate not to award prejudgment interest." *Id*. at 657.

8. Applying this precedent, the Federal Circuit has repeatedly held that the purpose of prejudgment interest is "to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement." *See, e.g., Hockerson–Halberstadt, Inc. v. Propet USA, Inc.*, 62 Fed. App'x 322, 334 (Fed. Cir. 2003) (*quoting Gen. Motors Corp.*, 461 U.S. at 655 (internal quotation marks omitted)). As such, "[p]rejudgment interest has no punitive, but only compensatory, purposes." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996) (*quoting Bio–Rad Lab., Inc. v. Nicolet Instrument*

*Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986)). Therefore, "[a]lthough the rate of prejudgment interest is a matter left largely to the discretion of the district court, the court must be guided by the purpose of prejudgment interest in exercising that discretion." *Hockerson–Halberstadt, Inc.*, 62 Fed. App'x at 334 (*quoting Bio–Rad Laboratories, Inc.*, 807 F.2d at 969 (citations omitted)).

9. To achieve this compensatory purpose, district courts have discretion to select an appropriate rate of interest. *See Gen. Motors Corp.*, 461 U.S. at 656–57. Courts in this District have awarded interest at the average rate of return on Treasury Bills, *see, e.g.*, *Joy Techs., Inc. v. Flakt, Inc.*, 954 F. Supp. 796, 808 (D. Del. 1996); *Phillips Petroleum Co. v. Rexene Corp.*, No. Civ. A. 90-208, 1997 WL 781856, at *28 (D. Del. Sept. 4, 1997), or at the prime rate as a proxy for the cost of borrowing, *see, e.g.*, *IMX, Inc. v. LendingTree LLC*, 469 F. Supp. 2d 203, 227 (D. Del. 2007). Although the Federal Circuit has upheld awards of prejudgment interest at the prime rate, the court was careful to emphasize that it did not "intend to establish any rule that prejudgment interest at the prime rate should be awarded as a matter of course in every case." *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988).

10. Because prejudgment interest is only meant to make the patent holder whole, district courts have awarded prejudgment interest at the actual interest rate paid by plaintiff. *See Rocket Jewelry Box, Inc. v. Quality Int'l. Packaging, Inc.*, 403 F.Supp.2d 288, 290-91 (S.D.N.Y. 2005) (accepting plaintiff's contention that the way "it can be made whole is by setting the rate on prejudgment interest at . . . the average interest rate paid on loans from its bank"); *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, No. 78-114, 1990 WL 293886, at *4 (D. Or. Sept. 19, 1990) (awarding "plaintiff prejudgment interest on its patent claims at the rate of interest *actually paid* by plaintiff") (emphasis in original); *cf. Slater v. Texaco, Inc.*, 506 F. Supp. 1099, 1116 (D. Del. 1981) ("The legal rate of interest prevailing in the forum state may be considered, but the district

4

court should endeavor to take account, to the greatest extent possible, of the prevailing interest rates and the actual cost to the plaintiff of borrowing money."). Although some courts have awarded interest based on an actual rate of borrowing that was higher than the prime rate to adequately compensate the plaintiff, *see Rocket Jewelry*, 403 F.Supp.2d at 290–91, the same logic should apply with equal force in selecting a rate *below* prime to avoid granting the plaintiff a windfall.

### B. In The Unique Circumstances Of This Case, Interest Should Be Calculated From The Date Each Infringing Batch Was Made.

11. Amgen gives itself a windfall well above what it would have actually received in interest had Hospira paid a reasonable royalty for each of the fourteen discrete instances of infringement found by the jury. In its calculations, Amgen applies the entire $70 million award as a lump sum well before any of the infringing batches were completed. Calculating interest based on a lump sum improperly inflates Amgen's prejudgment interest and thus would be an abuse of discretion.

12. Amgen argues that interest should accrue on the full $70 million damages award from "the date of the first patent infringement through the date of judgment." (D.I. 352, Amgen Motion for Prejudgment and Post-Judgment Interest ("Amgen Motion") at ¶ 6.) That methodology may make sense in a case where the defendant regularly manufactured and sold a product on an ongoing basis after the date of first infringement. But the facts in this case are different—Hospira did not continuously manufacture EPO from 2013 but had GSK make particular batches at scheduled times with lengthy gaps in between manufacturing campaigns. The Court knows from the jury verdict form exactly which batches the jury found to infringe and the date those particular batches were manufactured. There is no evidence that the jury expected

Hospira to pay $70 million before all the batches were made, rather than incrementally at the time each batch was manufactured.

13. In addition, awarding an upfront payment is inconsistent with the Safe Harbor that the jury found covered some batches. This case is one of the first BPCIA litigations (and the first BPCIA jury trial), and it took place in a regulatory landscape that is still evolving. For example, as Hospira explained in its JMOL motion, the FDA issued new draft guidance on biosimilarity on the very last day of trial which included a recommendation of using a minimum of 10 batches to conduct such an assessment. (*See, e.g.*, D.I. 357 at 4-5.) There was significant uncertainty as to how the Safe Harbor law would be applied to this case, as evidenced by the extensive discussions between the Court and the parties on the jury instructions. (*See, e.g.*, Trial Tr. 4:23-13:7; 6:11-12 (noting that this was an area of law the Court had not dealt with before); 1394:1-1405:5; 1399:5-6 (the Court noting that Amgen's expert admitted there is "wiggle room here").

14. In November 2013, neither party would have been certain how many batches of drug substance would be planned for manufacture, nor how many of those batches would be successfully manufactured. For example, as Dr. Billingham testified, Hospira experienced at least one manufacturing failure. (Trial Tr. 848:17-22; *see also* Bell Decl. ¶ 5.) Amgen's use of a lump sum in 2013 would have required the parties to speculate as to how many batches would be successfully manufactured, and whether those successful batches would have been protected by the Safe Harbor. Amgen's method of calculating interest thus fails to account for the uncertainty faced by the parties. Granting Amgen interest for the entire period from 2013 would go well beyond making Amgen whole.

6

15. In addition, the strong evidence presented by Hospira at trial weighs in favor of finding no prejudgment interest or a reduced amount of prejudgment interest. The Supreme Court has found that the Court may, in its discretion, "limit prejudgment interest, or perhaps even deny it altogether" in "circumstances in which it may be appropriate not to award prejudgment interest." *Gen. Motors Corp.*, 461 U.S. at 657. Justice Stevens specifically stated that courts "may . . . take into account the nature of the patent and the strength of the defendant's challenge." *Gen. Motors Corp.*, 461 U.S. at 658 (Stevens, J., concurring). Although the Federal Circuit has declined to adopt that position, it has recognized that the prejudgment interest must have some justification based on the record, including evidence of what the plaintiff "paid on its corporate borrowings during the period of infringement." *Bio-Rad*, 807 F.2d at 969.

16. Here, Hospira presented strong evidence from three fact witnesses and one regulatory expert that all twenty-one accused batches were used for purposes reasonably related to obtaining FDA approval. Because there was uncertainty regarding the Safe Harbor law and what would be reasonably related to FDA approval for one of the first U.S. biosimilar products, the parties would not have known how many batches were necessary or which batches would be protected by the Safe Harbor at the time of the first infringement. (In fact, the parties will not know for sure until Hospira's JMOL motion on the Safe Harbor and any appeals are resolved.) The Court should take these factors into account and award prejudgment interest that is appropriate in this case.

17. Given this uncertainty, interest on the jury's award of $70 million should be applied on a per-batch basis from the date of each identified infringement, which is the date of manufacture of each batch. *See, e.g., Oiness*, 88 F.3d at 1033 (interest calculated from "date of injury"). Here, unlike in other situations, the jury identified fourteen discrete acts of

7

infringement that can be traced to specific dates. (*See* DTX-255-0005, showing the "Date of Manufacture" of each batch.)[1]  Thus, the Court has adequate information to find that a royalty of $5 million per batch would have been applied by the parties at the time each infringing batch was successfully manufactured.  This removes the speculation inherent in Amgen's proposal, because at the date of manufacture of each batch, the parties would have known that the batch was successfully completed and would have had a more clear understanding of how that specific batch would be used to support Hospira's FDA approval.  Thus, Hospira's method properly accounts for the dynamics of drug substance manufacturing and gives Amgen no more compensation than necessary to make it whole.

18.     Moreover, the date of infringement for each batch should be the Date of Manufacture, not the "Thaw Date" that Amgen proposes.  (*Compare* DTX-255-00005 showing "Date of Manufacture" *with* DTX-131-0078 showing the "Thaw Date.")  In Amgen's lump-sum calculations, Amgen improperly uses November 10, 2013 as the date at which prejudgment interest begins to accrue.  That is not the date of the infringement, but is the date the cells were thawed to manufacture the first infringing batch, 410744.  *See Sun Studs, Inc.*, 1990 WL 293886, at *3 (Sept. 19, 1990) (noting that the Supreme Court has held that interest runs from the date of "infringement," not the date infringer would have entered into a royalty agreement).  Amgen introduced no evidence at trial that thawing cells infringed the '298 patent on EPO isoforms.  Rather, Amgen focused on Hospira's final EPO drug substance and its isoform content.  This is confirmed by the fact that the data Amgen relied upon to demonstrate infringement of claims 24 and 27 was generated from the *completed* EPO drug substance.  (Trial Tr. 486:18-489:18 (Dr. Cummings discussing testing of Hospira's completed drug substance lots as evidence of

---

[1] Trial exhibits cited herein are included in the appendix being filed concurrently herewith.

8

infringement); 508:21-511:2 (Dr. Cummings discussing testing of Hospira's drug *product* lots containing completed drug substance as evidence of infringement).) Therefore, it would be an abuse of discretion to base prejudgment interest on the thaw date. The proper date to measure interest for the first batch is the date of manufacture, December 9, 2013.

19. Thus, not only should a per-batch methodology be used, but it should be used to calculate interest for each batch based on its actual date of manufacture. Even if Amgen's lump-sum methodology were correct, which it is not, it should be adjusted to calculate interest from the date of manufacture on December 9, 2013, not the thaw date.

### C. The Prime Rate Should Not Be Used As An Inflated Proxy Where Amgen's Actual Borrowing Rate Is Known.

20. Amgen also arrives at an excessive prejudgment interest award based on its flawed use of the prime interest rate with quarterly compounding. The prime rate is sometimes used as an approximation of the cost of borrowing money, which courts in this District have found to be "a better measure of the harm suffered as a result of the loss of the use of money over time." *IMX, Inc. v. LendingTree LLC*, 469 F. Supp. 2d 203, 227 (D. Del. 2007); *see also*, D.I. 352, Amgen Motion at ¶ 5 ("[T]he prime rate *represents* the cost of borrowing money. . . ." (emphasis added)). However, adopting the prime rate in this case, where it is contrary to publicly available information about Amgen's actual cost of borrowing, would be improper.

21. Amgen failed to provide any justification as to why the prime rate was appropriate in this case, other than that it is commonly applied in patent cases in this District. Amgen's lack of justification is particularly noteworthy, given that the Federal Circuit has specifically declined "to establish any rule that prejudgment interest at the prime rate should be awarded as a matter of course in every case." *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988). Amgen has not offered any evidence that it actually

9

Case 1:15-cv-00839-RGA Document 376 Filed 11/20/17 Page 14 of 19 PageID #: 14342

borrowed money at such a high rate during the period of infringement. Although a party need not show that it borrowed at the prime rate in order for that rate to be used, where possible the determination of the most appropriate rate should be tied to the facts of the case. *See, e.g., Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (finding no clear error in awarding the treasury rate where there was no evidence that [plaintiff] borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of [defendant's] infringement"); *Bio-Rad*, 807 F.2d at 969 (explaining that the evidence in the record supported "either the prime rate or the rate that Bio-Rad paid on its corporate borrowings during the period of infringement"); *cf. Slater v. Texaco, Inc.*, 506 F. Supp. 1099, 1116 (D. Del. 1981) ("[T]he district court should endeavor to take account, to the greatest extent possible, of the prevailing interest rates and the actual cost to the plaintiff of borrowing money.").

22.   Amgen's average cost of borrowing compounded quarterly is the only way to make Amgen whole without overcompensating Amgen or improperly punishing Hospira. It accurately reflects the cost Amgen would have had to pay to obtain the judgment amount through a loan because Hospira had not yet paid the royalty. Because Amgen is a financially secure company with an "A" bond rating, it was able to borrow at a rate significantly less than the prime rate. (Bell Decl. ¶ 8.) Using Amgen's average cost of borrowing based on the average yield for U.S. corporate bonds for "A" rated borrowers, prejudgment interest should be $4,843,892.

23.   Indeed, Amgen's 2016 10-K filing shows that it borrowed money at a rate of LIBOR + 1% during the relevant time period. (Exhibit 1, Excerpts of Amgen's 2016 10-K at 51 ("In 2014, we entered into a $2.5 billion syndicated, unsecured, revolving credit agreement

which is available for general corporate purposes or as a liquidity backstop to our commercial paper program. . . . Generally, we would be charged interest at LIBOR plus 1% for any amounts borrowed under this facility."); *id.* at F-29 ("In 2013, we borrowed $5.0 billion under a Term Loan which bears interest at a floating rate based on LIBOR plus additional interest, initially 1%, which could have varied based on the credit ratings assigned to our long-term debt by Standard & Poor's Financial Services LLC (S&P) and Moody's Investor Service, Inc. (Moody's)."); *see also* Bell Decl. ¶ 7.)

24. Using LIBOR + 1% to calculate the prejudgment interest would result in an even lower prejudgment interest amount of $4,659,200. (Bell Decl. ¶ 10.) Thus, using Amgen's average cost of borrowing, which results in even higher interest, is more than enough to compensate Amgen, and yet is much less than the inflated and artificial prime rate that Amgen requests.

25. In light of the above, it would be improper for the Court to award the prime interest rate as Amgen suggests, simply because it has been done in other cases. Instead, the Court should base the interest rate on Amgen's actual average cost of borrowing as shown in public filings. To do otherwise would provide a windfall to Amgen, improperly punish Hospira, and constitute an abuse of discretion.

### D. The Court Should Adopt Hospira's Proposed Prejudgment Interest.

26. For the reasons discussed above, if the Court awards prejudgment interest, it should apply the interest calculations on a per-batch basis, apportioning the damages award from the date each batch was actually manufactured (not the date the cells were thawed) through the date of judgment, September 25, 2017. The verdict form indicated exactly how many batches were deemed to infringe, and the jury's award of $70 million is exactly $5 million per batch.

11

The Court should also choose the interest rate that reflects Amgen's actual average cost of borrowing.

27. These calculations are discussed in the Declaration of Gregory K. Bell, Ph.D. and are summarized in the table below. The lump-sum and prime-rate calculations are provided for comparison only. The prime rate calculation is different from that proposed by Dr. Heeb because it reflects the proper treatment of the principal during the first quarter of interest and the correct date of first infringement (the date of manufacture rather than the thaw date).

|  | **Lump-Sum Royalty** *for comparison only, should not be adopted | **Per-Batch Royalty** |
|---|---|---|
| **Prime Rate** *for comparison only, should not be adopted | $9,823,127 | $7,648,315 |
| **Amgen's Average Debt Rate** | $6,276,396 | **$4,843,892** |

28. As shown, the appropriate royalty would be $4,843,892, which reflects a per-batch royalty using Amgen's actual average cost of borrowing and reflects the position Amgen would have been in had the parties entered into a reasonable royalty agreement. Awarding prejudgment interest in this amount would be a proper exercise of the Court's discretion, and would be sufficient to make Amgen whole without overcompensating Amgen or improperly punishing Hospira.

## III. POST-JUDGMENT INTEREST

29. Hospira recognizes that post-judgment interest is mandated by 28 U.S.C. § 1961, and does not oppose post-judgment interest to the extent such interest is calculated as dictated by

that statute.[2] *See* 28 U.S.C. § 1961 ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.").

30. However, Amgen's methodology for calculating post-judgement interest is incorrect for at least two reasons: (1) Amgen incorrectly asserts that post-judgment interest does not accrue until the Court enters a final judgment; and (2) Amgen improperly asserts that it is entitled to post-judgment interest on prejudgment interest prior to the award quantifying the prejudgment interest owed to Amgen. These two points are discussed in detail below.

### A. The Court's September 25, 2017 Judgment Marks the Date on Which Post-judgment Interest Begins to Accrue.

31. Amgen makes the unsupported assertion that post-judgment interest should accrue only after the Court enters final judgment. (*See* D.I. 352, ¶ 12.) But Amgen's bald statement ignores binding Third Circuit precedent that a "judgment" as used in § 1961 does not mean a final, appealable judgment. *See Skretvedt v. E.I. Dupont de Nemours*, 372 F.3d 193, 216–17 (3d Cir. 2004) (holding that the mere fact that the "judgment was not a final order for purposes of appeal would not otherwise prevent postjudgment interest from running under § 1961"); *see also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1177–78 (3d Cir. 1993) ("[§ 1961] does not, by its terms, mandate that the judgment from which interest is calculated must be a final judgment."); Memorandum Order, *E.I. Dupont de Nemours & Co., v. Unifrax I LLC*, C.A. No. 14-1250-RGA (D. Del. September 12, 2017) (granting post-judgment interest from the date of a non-final judgment).

---

[2] Because Amgen has not set out the exact method it will use to calculate post-judgment interest, Hospira reserves the right to challenge any aspect of Amgen's post-judgment interest calculation.

32. Thus, contrary to Amgen's assertion, in the Third Circuit post-judgment interest begins to accrue on the entry of an order by the Court that places a definite, monetary value on the amount owed to the prevailing party. *See Eaves v. Cty. of Cape May*, 239 F.3d 527, 534-35 (3d Cir. 2001) (ruling that post-judgment interest accrued from "the date on which the court quantified the amount . . . and awarded plaintiff a fixed sum"); *see also Skretvedt*, 372 F.3d at 217. Here, the prejudgment interest period should end and post-judgment interest should begin to accrue from September 25, 2017, the date on which the Court entered Judgment on the jury verdict of September 22, 2017. (D.I. 327). That is the date on which the Court placed a definite monetary value on the amount Hospira owed to Amgen. Accordingly, Hospira requests the Court award post-judgment interest on the $70 million jury award beginning on September 25, 2017, not on the date of final judgment as suggested by Amgen.

**B. Post-Judgment Interest Does Not Accrue On Prejudgment Interest Until An Order Quantifying Prejudgment Interest Is Entered.**

33. Amgen is also incorrect that post-judgment interest on any prejudgment interest which the court may award is to be calculated from the date that final judgment is entered. (*See* D.I. 352, ¶ 13.) The Third Circuit has held that post-judgment interest on an award of prejudgment interest will not accrue until an order is "entered quantifying the amount in prejudgment interest owed" to the prevailing party. *Travelers Cas. and Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 175 (3d Cir. 2010).

34. Here, the Court has yet to issue an order quantifying the amount of prejudgment interest owed by Hospira, and as such, post-judgment interest on the award of prejudgment interest has not yet been triggered. Accordingly, Hospira requests that the Court grant Amgen post-judgment interest on its prejudgment interest only after the Court enters an order quantifying the amount of prejudgment interest owed by Hospira.

## IV.     CONCLUSION

35.     Hospira respectfully requests that the Court deny Amgen's request for prejudgment interest altogether, or assess prejudgment interest using a per-batch methodology and an interest rate that reflects Amgen's actual average cost of borrowing.  Hospira also respectfully requests that the Court award prejudgment interest only through September 25, 2017 and post-judgment interest from that date until the award is paid on the underlying judgment, and post-judgment interest on any prejudgment interest awarded from such future date as the amount of prejudgment interest is fixed by the Court until the award is paid.

OF COUNSEL:

WILLKIE FARR & GALLAGHER LLP
Thomas J. Meloro
Michael W. Johnson
Heather M. Schneider
Dan Constantinescu
M. Diana Danca
Tara L. Thieme
Philip F. DiSanto
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

  /s/ Dominick T. Gattuso
Dominick T. Gattuso (# 3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Hospira, Inc.*